UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

JEREMIAH MAYNARD,                                    :

                       Petitioner,                    :                 **REPORT AND**
                                                                       **RECOMMENDATION**
          - against -                      :                 **TO THE HONORABLE**
                                                                 **WILLIAM H. PAULEY III**
                                                              :

SUPERINTENDENT WILLIAM D. BROWN,      07 Civ. 10480 (WHP)(FM)
                                                              :

                       Respondent.

--------------------------------------------------------x

```
┌─────────────────────────────────────┐
│ USDC SDNY                           │
│ DOCUMENT                            │
│ ELECTRONICALLY FILED                │
│ DOC #: _____             │
│ DATE FILED: 03/11/2009              │
└─────────────────────────────────────┘
```

**FRANK MAAS**, United States Magistrate Judge.

I.    Introduction

        Jeremiah Maynard ("Maynard") brings this habeas corpus proceeding pursuant to 28 U.S.C. § 2254 ("Section 2254") to challenge his conviction, on two counts of Rape in the First Degree, following a jury trial in Supreme Court, Bronx County.  On May 22, 2003, Justice John Barone, before whom the case was tried, sentenced Maynard to two consecutive five-year terms of imprisonment, to be followed by five years of post-release supervision.

        In his habeas petition ("Petition" or "Pet."), Maynard, a deaf-mute from infancy, claims that he was denied the effective assistance of counsel because he could not communicate effectively with his attorney.  In particular, Maynard contends that he was unable to understand the charges against him, explain his version of events to his attorney, or make an informed decision regarding his right to testify in his own defense.

(Pet. ¶ 12(a)).  For the reasons that follow, Maynard's petition should be denied.

Additionally, Maynard should be denied a certificate of appealability because he has

failed to make the substantial showing of the denial of a constitutional right required by

28 U.S.C. § 2253(c)(2).

II.    Background

Maynard is a deaf-mute who communicates primarily through American

Sign Language ("ASL").  (Pet. ¶ 12(a); Pet'r's Mem. at 8).[1]  On July 13, 2001, Maynard

was indicted on two counts each of Rape in the First Degree, Rape in the Second Degree,

Sexual Abuse in the First Degree, and Endangering the Welfare of a Child.  (A. 5).  These

charges stemmed from two incidents in which Maynard allegedly raped Melody A., a

thirteen-year-old girl in his neighborhood.[2]

A.    Pre-trial Proceedings

On January 24 and 25, 2002, the Honorable Phylis Skloot Bamberger

conducted a pretrial hearing pursuant to People v. Rodriguez, 79 N.Y.2d 445 (1992), to

_____

[1]    "Pet'r's Mem." refers to Maynard's memorandum of law in support of his
Petition; "A." refers to the appellant's state court appendix; "Bock Aff." refers to the affidavit of
Norman P. Bock, Esq., sworn to on August 7, 2008, in support of the Petition; "Lawrence Aff."
refers to the affidavit of Maynard's mother, Enid Lawrence, in support of Maynard's motion to
vacate his judgment of conviction, sworn to on March 7, 2005; "Maynard Aff." refers to
Maynard's own affidavit in support of that motion, sworn to on March 10, 2005; "Resp't's Aff."
refers to the Respondent's affidavit in opposition to the Petition; "Resp't's Mem." refers to the
Respondent's memorandum of law.

[2]    Pursuant to New York Civil Rights Law § 50-b(1), the Respondent's papers do
not use the full name of the victim.  I have adopted the same procedure to protect her privacy.

2

determine whether Melody A. knew Maynard sufficiently well that her prior show-up identification of him would not taint an in-court identification.  (A. 30-59).  A sign language interpreter was present in the courtroom both days.  (Id. at 31, 45).  At the hearing, Melody A. testified that she had seen Maynard in her neighborhood "[a]bout seventy times."  (Id. at 41, 49).  Melody A. also testified that she and Maynard had waved to each other and that he wrote notes to her.  (Id. at 42, 50).

In light of this testimony, Justice Bamberger was understandably perplexed by defense counsel's request for a Rodriguez hearing and engaged in the following colloquy with Maynard's retained defense counsel, Kirk Palma, Esq. ("Mr. Palma"):

| | |
|---|---|
| THE COURT: | Mr. Palma, have you been able to communicate with your client? |
| MR. PALMA: | Yes, I have. |
| THE COURT: | You use the sign language interpreter when you talk with him? |
| MR. PALMA: | I use his mother. |
| THE COURT: | Okay.  The reason why I'm asking these questions . . . [is] [i]n light of the testimony that I heard here . . . I'm quite dismayed that this is an issue which you didn't concede, that they knew one another. |
| MR. PALMA: | Judge, from communicating with my client, my client says he doesn't know her and he's never seen her.  When she walked in the courtroom yesterday, I asked him does he know her and he said no. |
| THE COURT: | Well, all right. |

3

> MR. PALMA:       If my client had stated to me that he knew her, I
>                  wouldn't waste the Court's time by asking for a
>                  hearing.
>
> THE COURT:       All right.  I'll accept your representation.

(Id. at 58-59).  During the hearing, Justice Bamberger did not question Maynard to

determine whether he believed that he had been able to communicate effectively with his

attorney despite the fact that his mother, rather than an ASL interpreter, had served as

their intermediary.  The Justice also did not inquire as to the extent of any physical or

cognitive deficits that Maynard may have had.  (Id. at 58-59).

At the conclusion of the hearing, Justice Bamberger found that there was no

Rodriguez issue.  (Id. at 59).  Thereafter, between February and October 2002, the court

adjourned the case nine times for various reasons, including the defense's claimed need

for the testimony of a police witness who was overseas on military duty.  (Id. at 69-127,

129).  An ASL interpreter was present on each court date.  (Id. at 70, 96, 105, 110, 113,

121, 123, 127, 128).  Ultimately, the case proceeded to trial before Justice Barone despite

the witness' absence.  (Id. at 132).

B.   Trial

1.   People's Case

The People's proof at trial would have permitted a reasonable juror to find

as follows:

In 1998, Melody A., then twelve years old, was living with her grandparents, Mary Avery and Clyde Balkaransingh ("Balkaransingh"), at 1560 Grand Concourse in the Bronx.[3]  (Id. at 148-49).  That summer, she saw Maynard for the first time while she was outside her building with her family.  (Id. at 149).  Maynard, who lived around the corner from Melody A., began clapping and smiling at Melody A.'s brother, who was learning to ride a bike.  (Id. at 149-50).  Melody A.'s family waved goodbye to Maynard as they left.  (Id. at 150).

Two or three weeks later, Melody A. saw Maynard while she and her family were in a park across the street from their apartment building.  (Id. at 150-51).  She approached the bench where Maynard was sitting and tried to speak to him.  (Id. at 151).  In response, Maynard removed a pen and paper from his pocket and began to write.  (Id.).  When Melody A. asked Maynard his name, he wrote, "Allen."  (Id.).

Melody A. saw Maynard around the neighborhood about seventy times over the course of the next year.  (Id. at 154).  On one occasion, Maynard rang the doorbell of Melody A.'s apartment while she was home from school and signaled for her to come to the door.  (Id. at 249).  Using a pen and paper given to him by Melody A.'s grandmother, Maynard wrote that Melody A.'s friend was waiting for her around the corner.  (Id. at 250-51).  Balkaransingh would not allow Melody A. to go downstairs with Maynard and shut the door.  (Id. at 298, 313).  Soon thereafter, when Balkaransingh left to go to work,

_____

[3]        Melody A. testified that she typically referred to her grandparents as her mother and father.  (Id. at 201, 226).

5

he saw Maynard outside the building.  (Id. at 305).  Balkaransingh cautioned Maynard not to come back to the apartment, using words and a hand signal to indicate that he should not press the doorbell.  (Id. at 305, 311).  Maynard appeared annoyed and responded by drawing his finger across his throat in a threatening gesture.  (Id. at 305-06).

Sometime between April 5 and 16, 1999, Melody A. was walking home from school when she again encountered Maynard.  (Id. at 159).  By then, she was thirteen years old, and Maynard was thirty-seven.  (Id.).  Maynard motioned for Melody A. to approach, then wrote on a piece of paper, "do you want to help me move some furniture?"  (Id. at 160).  After Melody A. wrote back, "yes," Maynard took a key from his pocket and opened a metal door to his building.  (Id.).  They walked down some steps to the back of the basement where Maynard used a key to open a second door.  (Id.).  Maynard then grabbed Melody A.'s arm, pushed her against the wall, pulled down her pants, and began vaginally raping her.  (Id.).  Melody A. tried to push Maynard away, but could not.  (Id. at 161).  After the rape, Melody A. went home, threw away her underwear, and washed up, telling no one about the incident for fear that she would be blamed.  (Id. at 162-63).

The second rape occurred between April 26 and May 7, 1999, as Melody A. was coming home from school.  (Id. at 164).  On this occasion, she entered the elevator of her building and pressed the button for the third floor, but the elevator went down instead. (Id. at 167).  Maynard was standing outside the elevator when it reached the basement.

6

(Id. at 168).  He pulled the door open and pointed a gun at Melody A.'s head, signaling for her to walk to the back of the room and stand against the wall.  (Id.).  Maynard then put the gun on a table behind him and vaginally raped Melody A.  (Id. at 169).  When Maynard left, Melody A. put on her clothes and went home.  (Id. at 170-71).  Once again, she washed up and threw away her underwear.  (Id. at 171).  Melody A. did not report this incident either[4] and did not go to a nearby hospital because she thought she was too young to go alone.  (Id. at 171-72, 211).

Soon after the second incident, Melody A. was involved in an altercation at school during which she used a razor to cut the face of a student who had been harassing her.  (Id. at 188-90).  She consequently was sent to the Tryon Girls Center in upstate New York for twelve months.  (Id. at 190-91).  Approximately two weeks before her release, Melody A. told Marie Gault, her youth aide at the Center, that she was afraid to return to her neighborhood because of Maynard.  (Id. at 192).  Gault, in turn, reported the rape to her supervisor, and Melody A.'s grandparents were informed.  (Id. at 193, 322).  When Melody A. returned home, her grandparents called the police, who interviewed her about both incidents.  (Id. at 193-94, 196).  Melody A. later identified Maynard as her assailant while canvassing the neighborhood with a police detective.  (Id. at 197).  The police arrested him immediately after the identification.  (Id. at 198).

---

[4]        As Melody A. explained, when she was six years old, she told her grandmother that her mother's friend had "touched" her.  (Id. at 212-13, 245).  After the police became involved, Melody A.'s mother moved away and did not call for years.  (Id. at 245-46).  At that point, Melody A. began living with her grandparents.  (Id. at 246-47).

As part of its case, the People offered the expert testimony of Dr. Don Lewittes ("Dr. Lewittes"), a clinical psychologist, regarding Child and Adolescent Sexual Abuse Syndrome.  (Id. at 336-40).  As Dr. Lewittes explained, a sexually-abused child often delays disclosing the abuse because she may not know how to seek help and is concerned about the potential adverse consequences.  (Id. at 338, 340, 343-44).  A child also may try to "emotionally help" herself by washing her body or disposing of materials associated with the sexual act.  (Id. at 341).  The delay in a child's outcry may be greater if she fears for her safety because the perpetrator lives nearby.  (Id. at 347).

2.    Defense Case

Maynard did not testify at trial.  (Pet. ¶ 11).  The defense nevertheless challenged Melody A.'s account of both rapes through other witnesses.

Charles Chesson ("Chesson"), the superintendent of Maynard's co-op building, testified that, consistent with building policy, only he had a key to the locked rooms in the basement.  (A. 367-68).  Chesson conceded, however, that he began working at the building after the incidents and had no personal knowledge as to the practices of the previous superintendent.  (Id. at 372-73).  Chesson also conceded that there were times when Maynard would roam the basement looking for items such as televisions to fix. (Id. at 373).

Maynard's neighbor of ten years, Minnette Parkes ("Parkes"), testified that the basement was a heavily-trafficked area and that, as far as she knew, only the

8

superintendent had a key to the locked rooms located there.  (Id. at 387-89).  Parkes also

testified that Maynard had difficulty communicating, even through the use of a pen and

paper, and often wrote incomprehensible "scrambled" sentences.  (Id. at 386, 394-95).  If

she wanted Maynard to do some work for her, she would physically demonstrate the task.

(Id. at 386).

Finally, Winnett Chambers, Maynard's neighbor of fourteen years, agreed

that Maynard had extremely limited writing skills and could not write full sentences.

(Id. at 398-99).  She also opined that Maynard probably would not have been able to write

the word "furniture."  (Id. at 405).

C.      Conviction and Sentencing

On the second day of deliberations, the jury found Maynard guilty of two

counts of Rape in the First Degree.  (Id. at 502).  Thereafter, on May 22, 2003, Justice

Barone sentenced Maynard to two consecutive five-year prison terms, to be followed by

five years of post-release supervision.  (Id. at 14).

D.      Subsequent Procedural History

1.      Collateral Motion

Following his sentencing, Maynard retained Norman Bock, Esq. ("Mr.

Bock"), who also represents him in this proceeding.  On March 21, 2005, Mr. Bock

moved to vacate Maynard's conviction pursuant to Section 440.10 of the New York

Criminal Procedure Law ("CPL"), alleging that Mr. Palma had provided ineffective

assistance at trial.  (Resp't Aff. Ex. 1).  In his papers, Mr. Bock claimed that because Mr.

Palma failed to use a competent ASL interpreter for out-of-court conferences, Maynard

was unable to (a) comprehend the nature of the charges against him, including the

difference between First and Second Degree Rape; (b) relate his version of events to his

attorney; or (c) understand and make an informed decision regarding his right to testify in

his own defense.  (Resp't Aff. Ex. 1 ¶ 5).  Mr. Bock further revealed that Maynard had

admitted to him that he had sex with Melody A. but stated that it was consensual and that

he had paid her money.  (Id. ¶ 14).  Mr. Bock contended that if Maynard had testified to

these facts, which Maynard allegedly never conveyed to Mr. Palma, it might "well have

led to a dramatically different result" – namely his conviction on the lesser-included

crime of Rape in the Second Degree.  (Id. ¶ 63, 74).

On December 20, 2005, Justice Barone denied the motion on two grounds.

(Resp't's Mem. Ex. 5).  First, with respect to the reasonableness of Mr. Palma's actions,

Justice Barone noted that Maynard had admitted to Mr. Bock that he had sex with a

thirteen-year old girl.  (Id. at 1).  Although second-degree (statutory) rape is a lesser

offense, the Justice concluded that "[t]he failure of the defendant to take the stand in his

own defense in order that he might admit guilt of a felony . . . constitute[d] an issue of

trial tactics."  (Id.).  The Justice noted further that "the decision to call defendant as a

witness would [have been] a highly questionable one, even if [the] defense were aware of

defendant's contentions."  (Id.).

Turning to the issue of prejudice, Justice Barone observed that it was "certainly questionable" whether Maynard's admission that he was guilty of a lesser felony would have helped him and "purely speculative to assert that a jury would, based on such testimony, have then disbelieved the young complainant and convicted the defendant of the lesser charge."  (Id. at 2).[5]

Maynard sought leave to appeal the denial of his Section 440.10 motion to the Appellate Division, First Department.  On May 16, 2006, that court denied his application, stating that no question of law or fact was presented that warranted review. (Resp't Mem. Ex. 9).

    2.    <u>Direct Appeal</u>

On July 11, 2005, Maynard appealed his conviction to the Appellate Division, contending that Dr. Lewittes' expert testimony and Balkansingh's description of the "threatening gesture" were improperly introduced, and that the trial court had erred by failing to grant him an adjournment to secure the testimony of the police officer on military leave.  (Resp't Mem. Ex. 2).  On June 27, 2006, the Appellate Division unanimously affirmed Maynard's judgment of conviction.  See People v. Maynard, 818 N.Y.S.2d 56 (1st Dep't 2006).  In its decision, the court concluded that the admission of testimony regarding Maynard's threatening gesture was not an abuse of discretion

---

[5]    Justice Barone further concluded that Maynard's motion had to be denied pursuant to CPL § 440.10(2)(b) because sufficient facts appeared on the record to allow review of the issue on direct appeal.  (Id.).

because it "permitted the jury to draw reasonable inferences concerning [Maynard's] future intent and motive, and his relationship with the victim." Id. at 58.  The court also found that the denial of the adjournment request was a proper exercise of judicial discretion since the date of the witness' return was uncertain, the proposed testimony related to a "minor point," and the People had offered a "reasonable stipulation" that Maynard declined.  Id.  Finally, the court held that Maynard's claims regarding Dr. Lewittes were unpreserved and, in any event, not meritorious because his opinions were "not offered to prove that the rapes actually occurred," and were subject to proper limiting instructions.  Id.

Maynard sought leave to appeal the affirmance of his conviction to the Court of Appeals which denied that relief on August 24, 2006.  See People v. Maynard, 7 N.Y.3d 815 (2006) (table).

### 3.    Habeas Petition

Maynard timely filed his Petition on November 18, 2007.  See 28 U.S.C. § 2244(d)(1)(A) (habeas petition is subject to one-year statute of limitations running from "the date on which the judgment becomes final"); Valverde v. Stinson, 224 F.3d 129, 132 (2d Cir. 2000) (conviction becomes final "when the ninety-day period to seek review from the United States Supreme Court by way of certiorari expire[s]").  In his Petition, Maynard alleges that because he communicates through ASL rather than written or spoken English, he was unable to communicate effectively with his attorney, who never

used an ASL interpreter.  (Pet. ¶ 12(a)).  Maynard alleges that he therefore received

ineffective assistance of counsel.  (Id. at ¶ 12).  Finally, Maynard asserts that he is

"factually innocent of the charges" since the rapes did not involve the use of force.  (Id. at

¶ 12(a)).

III.    Discussion

    A.    Standard of Review

        A habeas corpus petition is not a vehicle to relitigate every issue previously

determined in state court.  Herrera v. Collins, 506 U.S. 390, 401 (1993).  Instead, a state

prisoner seeking habeas relief under Section 2254 must show by a preponderance of the

evidence that he is "in custody in violation of the Constitution or laws or treaties of the

United States."  28 U.S.C. § 2254(a).  The petitioner thus has the burden of proving, by a

preponderance of the evidence, that his rights have been violated.  See Jones v. Vacco,

126 F.3d 408, 415 (2d Cir. 1997).

        Section 2254, as amended by the Antiterrorism and Effective Death Penalty

Act of 1996 ("AEDPA"), provides, in part, that:

> An application for a writ of habeas corpus on behalf of a
> person in custody pursuant to the judgment of a State court
> shall not be granted with respect to any claim that was
> adjudicated on the merits in State court proceedings unless
> the adjudication of the claim –
>
>     (1) resulted in a decision that was contrary to, or
> involved an unreasonable application of, clearly established

> Federal law, as determined by the Supreme Court of the
> United States.

28 U.S.C. § 2254(d)(1) (emphasis added).

As the Second Circuit has noted, the Supreme Court has "construed the amended statute so as to give independent meaning to 'contrary [to]' and 'unreasonable.'" Jones v. Stinson, 229 F.3d 112, 119 (2d Cir. 2000). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). Under the "unreasonable application" clause, a federal habeas court should "ask whether the state court's application of clearly established federal law was objectively unreasonable." Id. at 409. This standard does not require that reasonable jurists all would agree that the state court was wrong. Id. at 409-10. Rather, the standard "falls somewhere between 'merely erroneous and unreasonable to all reasonable jurists.'" Stinson, 229 F.3d. at 119 (quoting Francis S. v. Stone, 221 F.3d 100, 109 (2d Cir. 2000)).

Section 2254(d)(2) also authorizes the federal courts to grant a habeas writ when a claim considered on the merits in state court "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

14

Finally, to the extent that a habeas petition challenges factual findings, Section 2254(e)(1) provides that: "a determination of a factual issue made by a State court shall be presumed to be correct" and "[t]he [petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

"If, after carefully weighing all the reasons for accepting a state court's judgment, a federal court is convinced that a prisoner's custody . . . violates the Constitution, that independent judgment should prevail." Williams, 529 U.S. at 389.

B.    Ineffective Assistance of Counsel

To prevail on an ineffective assistance of counsel claim, Maynard must demonstrate (a) that his counsel's performance "fell below an objective standard of reasonableness" and (b) that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 688, 694.  In connection with the first of these requirements, Maynard must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689.  As the Second Circuit has noted, "[t]he Strickland standard is rigorous, and the great majority of habeas petitions that allege constitutionally ineffective counsel founder on that standard." Lindstadt v. Keane, 239 F.3d 191, 199 (2d Cir. 2001).

Maynard asserts that the state court's decision finding him not to have been deprived of the effective assistance of counsel was an unreasonable determination of the

facts, as well as an unreasonable application of the law set forth in <u>Strickland</u>.  (Bock Aff. ¶ 35).  Specifically, Maynard contends that his counsel was ineffective because the failure to employ an ASL interpreter meant (a) Maynard could not communicate his version of events so that his counsel could formulate an effective defense, (b) counsel never adequately explained the nature of the charges against him, and (c) he therefore was not able to make an informed decision about whether to testify.  (Pet. ¶ 12(a)).  In short, Maynard claims that Mr. Palma's performance was objectively unreasonable.  Maynard further alleges that he suffered prejudice because, had he testified or otherwise conceded that he had what he claims was a consensual sexual encounter with a minor, "there is more than a reasonable probability that a jury would have given the petitioner the benefit of the doubt, and convicted him of only rape in the second degree, as opposed to rape in the first degree, certainly a more favorable outcome."  (Pet'r's Mem. at 16-17; <u>see also</u> <u>id.</u> at 17 (suggesting that such a defense "<u>might</u> have led to a different and more favorable result") (emphasis added)).

    1.    <u>Reasonableness of Counsel's Performance</u>

"The Supreme Court has never decided what degree of interpretive assistance is constitutionally required for non-English speaking defendants."  <u>Sin v. Fischer</u>, No. 01 Civ. 9376 (GEL), 2002 WL 1751351, at *2 (S.D.N.Y. Jul. 26, 2002) (citing <u>United States v. Deist</u>, 384 F.2d 889, 901 (2d Cir. 1967)); <u>accord</u> <u>Ta v. Pliler</u>, No. CV 03-76-RSWL, 2009 WL 322251, at *13 (C.D. Cal. Feb. 6, 2009).  Nevertheless, the

Second Circuit has held that non-English speaking defendants have a constitutional right to an interpreter during criminal trials.  United States ex rel. Negron v. New York, 434 F.2d 386, 387 (2d Cir. 1970).  Thus, "[i]f the court is made aware that the defendant does not understand English, the court must inform the defendant that he has the right to an interpreter at state expense if he cannot afford one."  Suarez v. Stinson, No. 97 Civ. 3039 (DC), 1999 WL 335373, at *6 (S.D.N.Y. May 26, 1999) (citing Negron, 434 F.2d at 390-91).

Although the Second Circuit has not directly addressed the right of hearing-impaired persons to interpretive assistance, see Phillips v. Miller, No. 01 Civ. 1175 (DF), 2000 WL 33650803, at *10 (S.D.N.Y. Dec. 3, 2000), there is no reason to distinguish them from speakers of foreign languages.  See People v. Doe, 602 N.Y.S.2d 507, 509 (Crim. Ct. N.Y. County 1993); People v. Rivera, 480 N.Y.S.2d 426, 433 (Sup. Ct. N.Y. County 1984).  Indeed, New York has a statute specifically requiring that deaf persons be provided with qualified interpreters to interpret any legal proceedings in which they are a party or a witness.  See N.Y. Jud. Law § 390.

Here, as the statute requires, an official sign language interpreter was present throughout the on-the-record court proceedings.  (Pet'r's Mem. at 8-9).  Maynard complains, however, that Mr. Palma did not use a qualified interpreter to confer with him during or prior to the trial.  (Id.).  What he overlooks is the fact that Mr. Palma represented Maynard as retained counsel.  (Bock Aff. ¶ 16).  If Maynard and his family

17

had funds sufficient to retain a private attorney for trial (and later to retain appellate counsel and obtain the assistance of experts), there is no reason to believe that they could not also have hired an ASL interpreter to assist Mr. Palma in his discussions with Maynard.  In these circumstances, it is far from clear that Maynard's constitutional rights were infringed merely because someone who was not a certified interpreter served that role.

Maynard argues that his mother was an inadequate substitute because she lacked sufficient training and skill to translate his discussions with Mr. Palma.  In that connection, Maynard's mother alleges in her affidavit that she knows little ASL and often has difficulty communicating with her son.  (Lawrence Aff. ¶¶ 5-6).  Tellingly, however, neither Maynard nor his mother has suggested in their affidavits that their discussions with Mr. Palma were so hamstrung that Maynard did not understand the charges in the indictment, the differences between forcible and statutory rape, or that he had a right to testify on his own behalf.  Indeed, both of their affidavits are totally silent as to the substance of their discussions with Mr. Palma, stating only that no ASL interpreter was present.  (See Lawrence Aff.; Maynard Aff.).  From this omission alone, Justice Barone might reasonably have concluded, as he did, that Maynard's decision not to take the stand was tactical, rather than the result of failed communications between him and his counsel. See Elize v. United States, No. 02 Civ. 1350 (NGG), 2008 WL 4425286, at *7 (E.D.N.Y. Sept. 30, 2008) (counsel's failure to provide non-trial interpretive aid did not amount to

ineffective assistance, where petitioner failed to demonstrate any "disability borne of a language barrier"); Thai v. United States, No. 99 Civ. 7514 (CBA), 2007 WL 13416, at *7 (E.D.N.Y. Jan. 2, 2007) (rejecting ineffective assistance claim based, in part, on language difficulties because record contained no affidavits or other evidence to support contention that client was unable to communicate with attorney); Mui v. United States, No. 99 Civ. 3627 (SJ), 2005 WL 323704, at *4 (E.D.N.Y. Feb. 7, 2005) ("[p]etitioner's claim that counsel did not communicate effectively with him is belied by Petitioner's admission that his sister translated during the attorney-client consultations.").

Maynard's counsel attempts to fill this striking gap in the record through the submission of reports by two experts who did not participate in any aspect of Maynard's trial or trial preparation.  The first expert is Carol Lazorisak, Coordinator of the Deaf Studies Program at LaGuardia Community College.  Nearly nine months after the trial, Ms. Lazorisak accompanied Mr. Bock to a meeting with Maynard at Rikers Island. (Lazorisak Aff. ¶ 3).  During that meeting, she determined that Maynard's "primary language" was ASL, which she states is "a different language from English, with its own vocabulary, syntax, grammar, and culture."  (Id. ¶¶ 5-6).  Maynard also reported to Ms. Lazorisak that "he understood some, but not all" of what Mr. Palma had communicated to him in writing.  (Id. ¶ 7).  Significantly, Ms. Lazorisak's affidavit is devoid of any suggestion that Maynard ever indicated to her that he was unaware during the trial that

there was a difference between first and second degree rape or that he had a right to testify.

At best, Ms. Lazorisak's affidavit establishes that Maynard is a person of limited intelligence, who would have had "difficulty understanding abstract legal concepts," such as the right to testify in his own defense, even if these concepts were communicated to him through ASL. (Id. ¶ 9). In this respect, her affidavit is consistent with the report of Maynard's second expert, Barbara S. Cohen, a licensed psychologist conversant in ASL, who opines on the basis of her own interview that Maynard has an IQ of 69 on the Wechsler Adult Intelligence Scale, which constitutes mild mental retardation. (See Resp't's Aff. Ex. 1 (Cohen Report 5)). However, not even Mr. Bock has suggested that Maynard's mental capacity is so limited that he was unable to assist in his defense or know the difference between right and wrong.

The only other "evidence" that Maynard was deprived of his right to present the defense that his sexual relations with the thirteen-year old victim were consensual is Ms. Lazorisak's averment that Maynard told her nearly a year after the trial that "he wanted to tell his story" at trial. (Lazorisak Aff. ¶ 10). Maynard also told Ms. Lazorisak that he had been sworn as a trial witness, but did not testify because "he was told by the interpreter to 'stop.'" (Id.; see also Bock Aff. ¶ 13). The suggestion that Maynard was sworn as a trial witness is, of course, inconsistent with the trial record. Moreover, one of the central themes of Maynard's Petition is that the official court interpreter's interaction

with him was limited to translating the proceedings, a role which would not have given her an opportunity to direct him not to testify on his own behalf.

Mr. Bock also tries to fill in the gaps about Maynard's communications with his trial counsel by noting in his own affidavit that he spoke with Mr. Palma, who "confirmed that he never used a sign language interpreter when conferring with [Maynard] in his office," choosing instead to rely on "written notes and communications with the [Maynard's] family."  (Bock Aff. ¶ 20).  Mr. Bock does not reveal, however, anything further about his discussions with Mr. Palma nor what, if anything, Mr. Palma told him regarding the substance of his communications with Maynard.  Mr. Bock also does not suggest that Mr. Palma would have been unwilling to provide an affidavit regarding these subjects had he been asked.

Thus, while Maynard has established that no ASL interpreter was present during his out-of-court consultations with Mr. Palma, he has not demonstrated that the quality of their discussions was adversely impacted.  Indeed, when the issue was squarely raised by Justice Bamberger at the pretrial hearing – a proceeding which was being translated for Maynard by an official ASL interpreter – Maynard gave no indication that he was confused, nor did he protest Mr. Palma's representation that they had been able to communicate with the assistance of Maynard's mother.[6]  See Pham v. Beaver, 445 F.

---

[6]    In their memorandum of law opposing the Section 440.10 motion, the People represent that Mr. Palma represented to the prosecutor on September 20, 2005, that he, in fact, had no difficulty communicating with Maynard through his mother.  (Ex. 4 (Mem. of Law at 3)).  Since this statement does not appear in any affidavit or declaration, I have disregarded it.

Supp. 2d 252, 257 (W.D.N.Y. 2006) (denying petition because neither counsel nor the petitioner "ever complained that they were not able to communicate with or understand each other").  In these circumstances, there is no reason to believe that Justice Barone's rejection of Maynard's claim constituted an unreasonable application of the applicable law.[7]

      2.    Prejudice

      In any event, even if the Court were to assume that Maynard would have chosen to testify or otherwise affected Mr. Palma's defense strategy had they communicated through an ASL interpreter, Maynard also must show prejudice to prevail on his ineffectiveness claim.  Here, Maynard is unable to do so for several reasons.

      First, as Justice Barone correctly noted, Maynard's proposed defense would have required him to confess to two sexual encounters with a young girl.  He therefore would have bolstered a relatively weak case in which there was no physical evidence to corroborate the victim's testimony and the victim's outcry was significantly delayed.  To

---

[7]     In an effort to establish some constitutional violation, Maynard also suggests that the use of his mother as an interpreter was "improper on its face" because her presence "vitiated the attorney client privilege."  (Bock Aff. ¶ 30).  Both the federal and New York state cases agree that the privilege is waived if an attorney-client communication is disclosed to a third party.  See, e.g., In re von Bulow, 828 F.2d 94, 101 (2d Cir. 1987); People v. Osorio, 75 N.Y.2d 80, 84 (1989).  However, both jurisdictions also hold that the presence of an interpreter or other person needed to help transmit the client's information to the attorney does not destroy the privilege. See United States v. Kovel, 296 F.2d 918, 921-22 (2d Cir. 1961) (accountant); Stroh v. General Motors Corp., 623 N.Y.S.2d 873, 874-75 (1st Dep't 1995) (daughter present to help aged parent "recall, and perhaps relive," traumatic accident).  The mere fact that Mr. Palma used Maynard's mother as an interpreter therefore does not constitute ineffective assistance.

sell his defense, Maynard also would have had to convince the jury that his sexual relations with a thirteen-year-old girl were consensual – a task that obviously would have been difficult for any defendant and might well have proved Herculean for one who is mildly-retarded.  As Justice Barone correctly observed, it is "purely speculative to assert that a jury would, based on such testimony, have . . . disbelieved the young complainant and convicted the defendant of the lesser charge."  (Resp't's Mem. Ex. 5, at 2).

        Second, prior to trial, the prosecutor sought permission to introduce as part of the People's direct case evidence that Maynard had grabbed and squeezed the buttocks of a nine-year old girl in the elevator of his apartment building in 2001.  (See A. 70). Although Justice Bamberger rejected that testimony, reasoning that it was not relevant to the issue of identity, (id. at 71-72), the trial court might well have revisited that question if the key issue at trial was the victim's consent.  Had that evidence been received, the jury would have been even less likely to find that the sexual relations between Melody A. and Maynard were consensual.

        Finally, even if there were a "reasonable probability" that the jury would have given Maynard the "benefit of the doubt" and convicted him only of second degree rape, there is no reason to believe that Justice Barone would have been as magnanimous when it came time to impose sentence.  As the Respondent correctly observes, Rape in the First Degree carries a potential sentence of five to twenty-five years, while Rape in the

Second Degree carries a potential sentence of two to seven years.  N.Y. Penal Law §§70.02(3)(a),(c) (McKinney 2007).  Here, even if the sexual acts were consensual, they involved a man nearly three times the victim's age.  Accordingly, Maynard might well have received the same concurrent five-year sentences had he been convicted of Rape in the Second Degree.

* * *

In sum, Maynard has not established, as he must, that his trial counsel's representation of him fell below an objective standard of reasonableness and that he was prejudiced as a result.[8]  Maynard also has not shown that Justice Barone's factual findings with respect to these showings required by Strickland were objectively unreasonable.

V.    Conclusion

For the foregoing reasons, Maynard's petition should be denied.  Additionally, because Maynard has failed to make a substantial showing of the denial of a constitutional right, he should be denied a certificate of appealability.  See 28 U.S.C. § 2253(c)(2).

---

[8]    Since there is no issue of procedural default, I have not considered Maynard's innocence claim.  See generally, Aparicio v. Artuz, 269 F.3d 78, 90 (2d Cir. 2001).  In any event, "[a]ctual innocence requires 'not legal innocence but factual innocence.'"  Murden v. Artuz, 497 F.3d 178, 194 (2d Cir. 2007) (quoting Doe v. Menefee, 391 F.3d 147, 162 (2d Cir. 2004)).  Here, Maynard is not factually innocent since he admits that he is guilty of rape.

VI.    Notice of Procedure for Filing of Objections to this Report and Recommendation

The parties shall have ten days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure.  See also Fed. R. Civ. P. 6(a) and (d).  Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable William H. Pauley and to the chambers of the undersigned at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b).  Any requests for an extension of time for filing objections must be directed to Judge Pauley.  The failure to file these timely objections will result in a waiver of those objections for purposes of appeal.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).

Dated:      New York, New York
            March 11, 2009

FRANK MAAS
United States Magistrate Judge

25

Copies to:

Norman P. Bock, Esq.
Leibowitz & Bock
Fax: (212) 587-8699

Rither Alabre, Esq.
Office of the District Attorney
Fax: (718) 590-6523